# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ARI KALECHSTEIN, PH.D., <br><br> Plaintiff, <br><br> v. <br><br> MEHRDAD ABBASSIAN, M.D., P.C. d/b/a GERIATRIC CARE ASSOCIATES and MEHRDAD ABBASSIAN, M.D., individually, <br><br> Defendants. | No. 15 C 5929 <br><br> Magistrate Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

This is an action for breach of an employment agreement and related statutory violations stemming from an employment agreement between Plaintiff Ari Kalechstein, Ph.D. and Defendant Geriatric Care Associates. In Count I, Plaintiff alleges a brief of contract claim against Geriatric Care Associates. In Count II, Kalechstein alleges that both Defendants violated the Illinois Wage Payment and Collections Act. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons set forth below, summary judgment is granted in Defendants' favor.

# I. UNDISPUTED MATERIAL FACTS

Kalechstein is, and during the relevant period of 2005–2007 was, a California citizen. (Def.'s ¶ 1).[1] He is a clinical psychologist who is recognized for his expertise in neuropsychology. (Pl.'s ¶ 1). During 2005–2007, he operated his own neuropsychology practice but was not licensed to practice medicine in Illinois or elsewhere. (Def.'s ¶¶ 1–2). Defendant Mehrdad Abbassian, M.D., is, and between 2005–2007 was, an Illinois citizen and a licensed psychiatrist under the Illinois Medical Practices Act. (*Id.* ¶ 4). He is the president of Mehrdad Abbassian, M.D., P.C. d/b/a Geriatric Care Associates (GCA). (*Id.*). GCA is a professional organization formed under the Medical Corporations Act with its principal place of business in Illinois. (*Id.* ¶ 6). GCA provides psychiatry, psychology, and neuropsychology services to the geriatric population. (Pl.'s ¶ 7). Since its inception, Abbassian has been the sole shareholder, officer, and director of GCA. (Def.'s ¶ 5).

In mid-2005, Drs. Abbassian and Kalechstein decided to form a partnership to combine their specialties to better serve geriatric patients suffering from dementia and other related disorders. (Def.'s ¶ 8). The parties consulted with lawyers from Katten Muchin Rosenman LLP, who advised them that a nonphysician could not be a partner in a medical corporation. (Pl.'s ¶ 12). They subsequently consulted with an attorney from Arnstein & Lehr, who drafted the parties' arrangement as an employment agreement. (*Id.* ¶¶ 13, 15). GCA and Kalechstein entered into the Em-

---

[1] Unless otherwise noted, all factual citations are to Plaintiff's Statement of Material Facts (Dkt. 47; *see* Dkt. 58 (Def.'s Resp.)) and Defendants' Statement of Material Facts (Dkt. 50; *see* Dkt. 61 (Pl.'s Resp.)).

ployment Agreement effective September 10, 2015. (Def.'s ¶ 17). The Agreement splits all revenue and expenses into two "Cost Centers." (Agmt. § 5.1(a)). "Cost center 1 shall be defined as revenues generated and expenses incurred solely by Dr. Abbassian . . . . Cost center 2 shall be defined as revenues generated and expenses incurred by all health care professionals other than Dr. Abbassian." (*Id.*). During the period of September 2005 through July 2007, GCA employed Jonathan Hess, Ph.D. and Alia Ammar, Ph.D. (Pl.'s ¶¶ 23–30). GCA also utilized the services of Danesh Alam, M.D., who was employed as an independent contractor. (*Id.*).

Kalechstein's compensation equaled his "Net Compensation" plus 50% of the "Ancillary Profits." (Agmt. § 5.1). Kalechstein's "Net Compensation" was defined as actual cash collections by GCA for direct care provided by Dr. Kalechstein less his actual expenses. (*Id.* § 5.1(b)–(c)). "Ancillary Profits" was defined as "actual cash collections from direct patient care services provided by cost center 2 less all costs incurred by [GCA] in providing those services." (*Id.* § 5.1(f)). The Agreement allowed the parties to set aside reserves for future expenses "as may be deemed reasonable and necessary." (*Id.* § 5(c)). Kalechstein understood that GCA had to be profitable before he was compensated, but there was no understanding about the level of profitability required or whether the profit would be invested in the company or distributed. (Def.'s ¶¶ 33–34).

The Agreement further provided that in the event of Kalechstein's death, GCA would "pay the executor of [Kalechstein's] estate one half [ ] of the ancillary profits for a period of five years. (Agmt. § 11). "Similarly, if Dr. Abbassian should die, then

[Dr. Kalechstein] shall pay the executor of Dr. Abbassian's estate one half [ ] of the ancillary profits for a period of five years." (*Id.*).

From 2005–2007, Kalechstein did not see any patients for GCA. (Def.'s ¶ 42). He came to Illinois twice during this period for a cumulative total of 40–60 hours. (*Id.* ¶¶ 43–44). Other than the two trips to Illinois, any other work performed by Kalechstein for GCA was done from California. (*Id.* ¶ 46). On or about July 19, 2007, Defendants terminated the Agreement. (*Id.* ¶ 49).

## II. DISCUSSION

### A. Summary Judgment Standards

Summary judgment is proper only if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). To avoid summary judgment, the party who bears the burden of proof cannot rely on the pleadings alone, but must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation omitted); *see Celotex*, 477 U.S. at 324 (Rule 56 "requires the nonmoving party to go beyond the

pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.") (citation omitted).

The Seventh Circuit "has recognized that summary judgment is particularly appropriate in cases involving the interpretation of contractual documents." *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 602 (7th Cir. 1989). "Where the contract is unambiguous, a court must determine the meaning of the contract as a matter of law." *Murphy v. Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus.*, 61 F.3d 560, 565 (7th Cir. 1995). A contract is unambiguous "if it is susceptible to only one reasonable interpretation." *Id.* The contract should be read as a whole so that all its parts will be given effect, *Preze v. Bd. of Trustees, Pipefitters Welfare Fund Local 597,* 5 F.3d 272, 274 (7th Cir. 1993), and related documents must be read together, *Lippo v. Mobil Oil Corp.,* 776 F.2d 706, 713 n. 13 (7th Cir. 1985).

**B. Analysis**

### *1. The Employment Agreement Is Invalid Under Illinois Law*

There is no dispute that the parties entered into the Employment Agreement. Defendants now assert that the contract is void under the Illinois Medical Practices Act (MPA). The MPA prohibits physicians from sharing fees with a nonphysician who did not personally perform patient treatment. 225 ILCS 60/22.2(a) ("A licensee under this Act may not directly or indirectly divide, share or split any professional fee or other form of compensation for professional services with anyone in exchange for a referral or otherwise, other than as provided in this Section 22.2."). Violating

this provision subjects the physician to discipline. *Id.* 60/22(A)(14). "The policy reasons behind the prohibition are the danger that such an arrangement might motivate a non-professional to recommend a particular professional out of self-interest, rather than the professional's competence." *TLC Laser Ctr., Inc. v. Midwest Eye Inst. II, Ltd.*, 306 Ill. App. 3d 411, 427 (1999) (citation omitted). Courts routinely invalidate medical service contracts sharing fees "with anyone" other than for services rendered by the nonphysician. *See Vine St. Clinic v. HealthLink, Inc.*, 222 Ill. 2d 276, 289, 292–93 (2006) (voiding contract for administrative services with physician practices because "[n]onphysicians can receive a fee for services rendered, apart from referral, but cannot receive a percentage of the physician's profit, or its equivalent"); *Practice Mgmt., Ltd. v. Schwartz*, 256 Ill. App. 3d 949, 954–55 (1993) (invalidating partnership agreement because "[u]nder the agreement at issue here, [nonphysicians] were to be compensated through a percentage of the net profits generated by the defendant physicians"); *Ctr. for Athletic Med., Ltd. v. Indep. Med. Billers of Illinois, Inc.*, 383 Ill. App. 3d 104, 112 (2008) (invalidating percentage fee agreement between physicians and medical billing services company "because defendants, nonphysicians, are prohibited from receiving a percentage of the physician's profit, or its equivalent").

Here, the Agreement compensates Kalechstein from patient care services by "cost center 2," which is defined as "revenue generated . . . by *all health care professionals* other than Dr. Abbassian." (Agmt. § 5.1(a)) (emphasis added). And "all health care professionals" is not restricted to nonphysicians. Indeed, any physician

other than Dr. Abbassian who provides patient care services on behalf of GCA must be included in cost center 2. (*See id.*) (defining "cost center 1" as revenues generated "solely by Dr. Abbassian" and "cost center 2" as revenue generated by *all other* health care professionals).[2] It is undisputed that during the relevant time period, Dr. Alam, an Illinois licensed medical doctor, provided patient care services on behalf of GCA and generated revenues through "cost center 2." (Pl.'s ¶ 30; Dkt. 61-1 (Alam Dep.) at 9, 40). Thus, the Agreement improperly permitted fees being shared between a medical doctor, Dr. Alam, and Plaintiff, a nonphysician.[3]

Kalechstein contends that because Dr. Alam was an independent contractor, and not an employee, he was not a "health care professional" and thus not a member of cost center 2. (Dkt. 60 at 10; Dkt. 63 at 9; *but see* Dkt. 47-4 (Kalechstein Dep.) (acknowledging that Dr. Alam is a "health care professional)). But even if an independent contractor is not an employee, the Agreement does not restrict "health care professionals" to employees. And it is undisputed that Dr. Alam provided patient care services for GCA during the relevant time period. (Pl.'s ¶ 30; Alam Dep. 40; Dkt 47-5 (Abbassian Dep.) at 208–09). More importantly, the revenue derived from Dr. Alam's patient services could only be included in cost center 2, and therefore,

---

[2] The parties' statements and briefs include significant factual disputes concerning the negotiations and prior drafts leading up to the Employment Agreement. However, because the Agreement's relevant terms are unambiguous, the Court has no need to review any parol evidence.

[3] The Agreement also violates the Psychologist Licensing Act, which prohibits psychologists from receiving any compensation for services not personally rendered. 225 ILCS 15/15(12) (prohibiting a licensed psychologist from "receiving from any person, firm, corporation, association or partnership any fee, commission, rebate, or other form of compensation for any professional service not actually or personally rendered").

rendered the contract void as a violation of the MPA since it would result in sharing physician-generated revenue with a nonphysician.

Even if Dr. Alam had not been contracted to perform medical services, the Agreement improperly gives Kalechstein, a nonphysician, a part in the management or control of GCA. The Act prohibits an unlicensed person from having any part in the ownership, management, or control of a medical corporation. 805 ILCS 15/13(a) ("No person who is not so licensed shall have any part in the ownership, management, or control of such corporation . . . ."); *see Frydman v. Horn Eye Ctr., Ltd.*, 286 Ill. App. 3d 853, 860 (1997) (finding that "the agreement is also illegal and unenforceable based on the impermissible ownership interest accorded plaintiff by the agreement"). The Agreement gives Kalechstein considerable control over accounting, overhead, and direct expenses. (Agmt. §§ 5.1(a) (GCA and Kalechstein "shall mutually agree on how to distribute revenues and expenses to each cost center"), 3.1 (Kalechstein and GCA shall "mutually agree" how much time he would devote to GCA), 3.2 (Kalechstein and GCA shall "mutually agree" upon which duties would be assigned to him), 5.1(c) ("Actual Expenses may include reserves for anticipated future expenses of [GCA] as may be deemed reasonable and necessary by [GCA] and [Kalechstein]."), 6 ("once a patient has been assigned to [Kalechstein], neither [GCA] nor any other employee of the Corporation shall exercise any direct supervision or control over the individual assessment of the patient")). Finally, the Agreement requires Plaintiff, a nonphysician, to exercise management or control of

GCA upon Dr. Abbassian's death by paying out 50% of the ancillary profits for five years. (*Id.* § 11).

Because the Employment Agreement directly violates the MPA, it is void as against public policy. *See E & B Mktg. Enterprises, Inc. v. Ryan*, 209 Ill. App. 3d 626, 630 (1991) (affirming trial court's ruling voiding contract because it contains prohibitive fee splitting); *Vine St. Clinic*, 222 Ill. 2d at 299 ("Where a contract is illegal or against public policy, the contract should not be enforced, because to allow such relief would undermine the policy considerations in prohibiting fee splitting.") (citation omitted). Further, where an agreement has been found to be in violation of the MPA, neither party is entitled to any monetary compensation from the other. *Vine St. Clinic*, 222 Ill. 2d at 299. ("In order to discourage professionals and nonprofessionals from attempting illegal fee splitting, the court will leave the parties where they have placed themselves.") (citation omitted).

Kalechstein asserts that because Defendants accepted the benefits of his performance, they are now estopped from claiming that the Agreement is unenforceable. (Dkt. 46 at 3; Dkt. 60 at 2–3). Even assuming that Kalechstein has substantially performed, which Defendants dispute (Dkt. 65 at 8), estoppel has no force with respect to a contract which is contrary to public policy, *see O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 349 (1989) ("a party to a contract which is contrary to public policy is not precluded from raising its illegality as a defense").[4]

---

[4] Defendants also contend that the Agreement is unenforceable because it is missing essential terms and is illusory. (Dkt. 49 at 9–11). Because the Court finds that the Agreement

Kalechstein has not established a genuine issue of material fact as to whether the Employment Agreement is valid and enforceable. Summary judgment is granted in GCA's favor on Count I.

### 2. *Plaintiff Has No Claims Under the IWPCA*

Plaintiff alleges that Defendants have violated the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1 et seq., by failing to pay him any of the amounts contractually owed to him pursuant to the Employment Agreement. (Am. Compl. ¶¶ 41–52). The IWPCA "requires that employers pay employees (within a certain time period) all wages and benefits they have *agreed* to pay." *Carmona v. Professionals, Inc.*, No. 15 C 8362, 2017 WL 1365590, at *2 (N.D. Ill. Apr. 14, 2017) (emphasis in original). The IWPCA, however, "does not establish a substantive right to payment of any particular regular or overtime wage." *Hoffman v. RoadLink Workforce Sols., LLC*, No. 12 C 7323, 2014 WL 3808938, at *4 (N.D. Ill. Aug. 1, 2014). "Instead, the Act allows employees to recover compensation owed by an employer 'pursuant to an employment contract or agreement between the 2 parties.'" *Tennessen v. Illinois Bell Tel. Co.*, No. 15 C 2784, 2016 WL 521046, at *3 (N.D. Ill. Feb. 10, 2016) (quoting 820 ILCS 115/2). Thus, to prevail on his IWPCA claim, Kalechstein "must first show that he had a *valid* contract or employment agreement." *Hess v. Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir. 2012) (emphasis added). An "agreement" is "broader than a contract" and "requires only a manifestation

---

contains prohibited fee-sharing provisions and improperly gives a nonphysician management and control over a medical corporation, the Court declines to consider whether the Agreement is also illusory.

of mutual assent on the part of two or more persons." *Id.* (quoting *Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 249 (2004)).

While Kalechstein correctly asserts that the IWPCA "requires only a manifestation of mutual assent on the part of two or more persons" (Dkt. 46 at 12), the only manifestation of mutual assent he references is the Agreement (*id.* at 12–15), which, as discussed above, is void as against public policy. *Cf. Zabinsky*, 347 Ill. App. 3d at 248–49 (while the lack of a written employment contract violated the statute of frauds, the IWPCA applied because of the oral agreement between the parties). Without a valid contract or employment agreement, Kalechstein cannot prevail on his IWPCA claim.

But even if the Agreement were considered "valid" for IWPCA purposes, Kalechstein still would not have an IWPCA claim. The Agreement does not set forth the specific amount of money owed at termination. The IWPCA "requires an employer to pay an employee any final compensation due under that contract or agreement at the time of separation." *Hess*, 668 F.3d at 452. The Act defines final compensation to include "wages, salaries, earned commissions, earned bonuses, . . . and any other compensation owed by the employer *pursuant to an employment contract or agreement* between the two parties." 820 ILCS 115/2 (emphasis added). "As the emphasized text makes clear, the IWPCA mandates payment of wages only to the extent the parties' contract or employment agreement requires such payment." *Hoffman*, 2014 WL 3808938, at *4. Indeed, the IWPCA plaintiff "must allege the existence of an agreement s*ubstantiating entitlement to the wages and compensation sought.*"

*Barker v. Atl. Pac. Lines*, No. 13 C 1272, 2013 WL 4401382, at *8 (N.D. Ill. Aug. 14, 2013) (emphasis added).

Kalechstein does not allege what amount he is owed under the IWPCA. Instead, he merely contends that "it is indisputable that Cost Center 2 was profitable during [his] period of employment, and [he] was therefore due monies pursuant to the Employment Agreement." (Dkt. 46 at 11); (*see also* Dkt. 60 at 13) (arguing that the compensation earned by Kalechstein "could have been calculated on the date [he] was terminated"). But the Agreement does not set forth the amount of money to which Kalechstein is entitled. Plaintiff's compensation was based upon GCA obtaining profitability, and the parties never agreed upon the level of profitability required. (Def.'s ¶¶ 33–34). The Agreement allowed the parties to set aside reserves for future expenses "as may be deemed reasonable and necessary." (Agmt. § 5(c)). Kalechstein testified that GCA had to be profitable before he was compensated, but acknowledged there was no understanding about the level of profitability required or whether the profit would be invested in the company or distributed. (*Id.*). Because the IWPCA requires only that the employer pay the agreed upon compensation, the Agreement's failure to include any specific rates warrants denial of Plaintiff's IWPCA claim. *See Hoffman*, 2014 WL 3808938, at *5 (dismissing IWPCA claim where Plaintiff failed to allege the rate of pay owed); *Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004) (rejecting an IWPCA claim for bonus pay where the employee "has no employment contract setting out the terms of his bonus"); *McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 544–45 (2009) (reject-

ing an IWPCA claim for bonus pay where the amount "could not possibly be known" at the time of termination); *Hess v. Bresney*, 784 F.3d 1154, 1162 (7th Cir. 2015) (rejecting an IWPCA claim for bonus pay where there was "no *unequivocal* promise that a bonus will be paid" and "not all of the required conditions for receiving the bonus" had been met at the time of termination) (emphasis in original); *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1176 (N.D. Ill.), *aff'd,* 843 F.3d 660 (7th Cir. 2016) ("Without mutual assent to the commission calculation sought by Plaintiffs, their claims under the Act fail."); *see also Grant v. Bd. of Educ. of City of Chicago*, 282 Ill. App. 3d 1011, 1022 (1996) (rejecting an IWPCA claim for payment of accumulated unused sick leave where no contract or agreement required such compensation).

The IWPCA also does not have an "extraterritorial reach"; rather, its "evident purpose is to protect employees *in Illinois* from being stiffed by their employers." *Glass v. Kemper Corp.*, 133 F.3d 999, 1000 (7th Cir. 1998) (emphasis in original); *accord Cohan*, 170 F. Supp. 3d at 1174. The Act does "protect[ ] an employee who performs work in Illinois for an Illinois employer, even if he resides in another state." *Adams v. Catrambone*, 359 F.3d 858, 863 (7th Cir. 2004). "However, the Act does not apply simply because an employee has performed *any* work in Illinois for an Illinois employer." *Cohan*, 170 F. Supp. 3d at 1174–75 (emphasis in original). Instead, the employee must have performed "sufficient" work in Illinois for IWPCA to apply. *Id*. at 1175; *Spaulding v. Abbott Labs.*, No. 10 C 199, 2010 WL 4822894, at *6

(N.D. Ill. Nov. 22, 2010); *Baxi v. Ennis Knupp & Assocs., Inc.*, No. 10-CV-6346, 2011 WL 3898034, at *14 (N.D. Ill. Sept. 2, 2011).

During the 97 weeks, from September 2005 through July 2007, that Kalechstein worked for GCA, he testified he worked in Illinois on only two occasions, working two to three days each time. (Kalechstein Dep. at 27–29, 34–35). Plaintiff argues that "[t]he number of occasions that [he] travelled to Illinois cannot be considered in a vacuum" and that considering the "volume and substance of his work," he "performed sufficient work" in Illinois. (Dkt. 60 at 14). But only 2% of Plaintiff's workweeks were spent in Illinois. Based upon this record, the Court finds that Plaintiff has not performed enough work in Illinois for the IWPCA to apply. *See Cohan*, 170 F. Supp. 3d at 1172–73, 1175) (where Plaintiffs "were only actually present in Illinois for, at most, a few days every year" and "while here, they were engaged primarily in training, not the actual sales work for which Plaintiffs were employed" the Act did not apply); *see also Glass*, 133 F.3d at 1000 (IWPCA inapplicable to employee who had not performed any work in Illinois); *cf. Adams*, 359 F.3d at 863 (IWPCA applies to nonresident employee "who performs [all] his work within Illinois for an instate employer"); *Baxi*, 2011 WL 3898034, at *14 (applying Act to a nonresident employee who performed "the overwhelming majority" of his work in Illinois).

## IV. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [48] is **GRANTED**, and Plaintiff's Motion for Summary Judgment [46] is **DENIED**.

E N T E R:

Dated: August 8, 2017

MARY M. ROWLAND
United States Magistrate Judge